**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

JUAN L. RODRIGUEZ,

      Plaintiff,

    v.

CAPITAL VISION SERVICES, LLC
*d/b/a* MY EYE DOCTOR,

      Defendant.

Civil Action No. 21-1222-RGA

## MEMORANDUM OPINION

Before me is Defendant My Eye Doctor's motion for summary judgment. (D.I. 33). The motion has been fully briefed. (D.I. 34, 39, 42). For the reasons set forth below, My Eye Doctor's motion is GRANTED in part and DENIED in part.

## I.  BACKGROUND

Plaintiff Juan L. Rodriguez filed this action on August 26, 2020, against his former employer, Defendant Capital Vision Services, d/b/a My Eye Doctor, (hereinafter "My Eye Doctor"). (D.I. 1). He alleges unlawful sex, sexual orientation, race, national origin, age, and disability discrimination, in violation of 42 U.S.C. § 2000e, *et. seq.*, (Title VII), 42 U.S.C. § 1981, 29 U.S.C. § 621, *et. seq.* (the ADEA), Del. Code Ann. tit. 19, §§ 710, 711 (Delaware's Discrimination in Employment Act, or DDEA), and 42 U.S.C. § 12101, *et seq.* (the ADA). He also alleges unlawful retaliation for the exercise of his FMLA rights, as well as unlawful

1

interference with his FMLA rights, under 19 U.S.C. § 2601, *et seq.* (the FMLA). (D.I. 1). My Eye Doctor moves for summary judgment on all these claims. (D.I. 33).[1]

### A.    Mr. Rodriguez's Employment with My Eye Doctor

My Eye Doctor is an eyecare practice with locations nationwide. (D.I. 35 at 105). At most of its locations, staff members report to a general manager, the general manager reports to a district manager, and the district manager reports to a regional manager. (*Id.*). Most locations are also staffed with one or more eyewear consultants, who assist patients in trying on and selecting glasses and other eyewear. (*Id.*).

Mr. Rodriguez is a 56-year-old, non-white Hispanic gay man. (D.I. 1 at 2). He was hired in 2011 by My Eye Doctor's predecessor as a general manager at the Seaford, DE location. (D.I. 35 at 21). After the acquisition, which took place in 2016 or 2017, Mr. Rodriguez became the general manager at the Milford, DE location. (D.I. 40 at 44). His responsibilities were to "run the office"—essentially, to supervise employees, attend to customers, and oversee the finances of the office. (*Id.* at 42, 52). Christy Jones was the district manager, and Larry Wills was the regional manager. (D.I. 33 at 2; D.I. 39 at 11). Mr. Rodriguez remained in this role until early 2019. (D.I. 33 at 3; D.I. 40 at 45).

While Mr. Rodriguez was at the Milford location, My Eye Doctor employed Michael Rager as a business operations specialist. (D.I. 35 at 19; D.I. 40 at 88). Mr. Rager visited Mr. Rodriguez's location approximately once a month to train employees and perform audits. (D.I. 40 at 88, 171-72). During his visits, Mr. Rager repeatedly called Mr. Rodriguez by Hispanic names other than his own (such as Hector, Pablo, and Jose), even though Mr. Rodriguez wore a

---

[1] I note that the evidentiary record is sparse. It contains only three depositions—those of Mr. Rodriguez, (D.I. 40 at 35-130) and two former My Eye Doctor employees, Holly Porter, (D.I. 35 at 50-62), and Corey Seronick, (*id.* at 36-49)—and two affidavits. (*Id.* at 105-114, 190-191 (Kelly Hollis), 115-117 (Brandy Smith)).

name tag and verbally corrected Mr. Rager numerous times. (D.I. 40 at 90, 176; D.I. 35 at 39-40, 54, 61).[2] On one occasion, while examining invoices in the presence of Mr. Rodriguez and Ms. Jones, his district manager, Mr. Rager recited a list of Hispanic surnames and then asked whether Ms. Jones noticed "a trend" with respect to patients given discounts. (D.I. 40 at 89).

On another occasion, while demonstrating to the Milford employees how to present glasses to a patient, Mr. Rager said, "I know it's gay, but you just have to do it that way." (D.I. 35 at 62; D.I. 40 at 100-101). Mr. Rager also made a comment about the Milford employees having recommended to him a "gay restaurant" at Rehoboth Beach (D.I. 35 at 55), and he performed a "limp wrist gay gesture" while discussing the restaurant's clientele. (D.I. 40 at 100).

In March 2017, Ms. Jones evaluated Mr. Rodriguez's performance during the 2016 year. (D.I. 35 at 124-29). Ms. Jones rated his "Success Factors" (e.g., percentage of sales goals met) 2.7 out of 5 (between "Below Expectations" and "Satisfactory") and rated most of his "Core Competencies" (relating to performance skills) between 2 and 3 out of 5 (between "Inconsistent" and "Meets Expectations"). (*Id.*). Ms. Jones expressed some concerns about his performance; for example, she noted inconsistent responsiveness to patients, lack of communication to other staff members, and issues with meeting deadlines. (*Id.* at 128-29).

In June 2017, it was discovered that one of the staff members supervised by Mr. Rodriguez conducted fraudulent transactions amounting to approximately $25,000 in funds stolen from My Eye Doctor. (D.I. 35 at 24). An investigation revealed that this incident occurred because Mr. Rodriguez had failed to check the transaction audit reports that were sent to his location daily, even though it was his responsibility to do so. (D.I. 40 at 51-52; D.I. 35 at 133). Mr. Rager and Ms. Jones both participated in the investigation. (D.I. 35 at 133). Consequently,

---

[2] Mr. Rager visited the Georgetown office several times after Mr. Rodriguez moved there in 2019, and he continued to refer to Mr. Rodriguez by Hispanic names other than Juan. (*Id.* at 96).

3

several days later, My Eye Doctor sent Mr. Rodriguez a final written warning that threatened "further disciplinary action up to and including termination of [Mr. Rodriguez's] employment" if Mr. Rodriguez continued to fail to perform these job duties. (*Id.*).

Ms. Jones continued to note Mr. Rodriguez's performance deficiencies, particularly with respect to his lack of responsiveness to patient requests, and in late 2018 she helped to develop a Personal Improvement Plan for Mr. Rodriguez. (*Id.* at 134-37). In January 2019, the regional manager, Mr. Wills, met with Mr. Rodriguez and offered him the choice between a transfer to the general manager position in Georgetown, DE or a demotion to an eyewear consultant at the Georgetown location. (D.I. 40 at 45-47). Mr. Rodriguez took the latter option (*id.* at 46) and he transitioned into the role on January 29, 2019 under general manager Calin Ropp.[3] (*Id.* at 55, 149). Brandy Smith, a non-Hispanic white woman under the age of 40 with no prior experience at My Eye Doctor and who did not submit a formal job application (*id.* at 143), was hired to take his place as general manager of the Milford location. (*Id.* at 65-66, 120, 122-23). My Eye Doctor subsequently promoted Ms. Smith to district manager after Ms. Jones resigned in June 2019. (D.I. 40 at 12-26; D.I. 35 at 115).

As an eyewear consultant, Mr. Rodriguez regularly met or exceeded his sales performance goals. (D.I. 40 at 49). Three other eyewear consultants worked alongside him, as of early 2020: Nadine Taube, Rhiannon Musca, and Brittany Straus. (D.I. 39 at 7; D.I. 35 at 156). Ms. Taube, like Mr. Rodriguez, had been with the practice at least five years. (D.I. 40 at 125). Ms. Taube is non-Hispanic and over 40 years old. (D.I. 35 at 116). Ms. Musca and Ms. Straus—both in their early twenties—had less experience with My Eye Doctor. (D.I. 40 at 104-05, 120-21, 124-25). Mr. Rodriguez testified that both women regularly referred to him as an "old man"

---

[3] There is some disagreement as to spelling. I adopt Mr. Rodriguez's version as to not only Ms. Ropp, but also as to Rhiannon Musca and Brittany Straus.

and a "dinosaur." (D.I. 40 at 82-84). Mr. Rodriguez also testified that he was excluded from meetings regarding policy and procedure changes. (*Id.* at 82).

### B. FMLA Leave

My Eye Doctor contracts with Cigna as a third-party administrator for its FMLA Administration. (D.I. 35 at 190). Under this agreement, Cigna unilaterally makes FMLA leave determination decisions for My Eye Doctor's employees. (*Id.*).

In July 2019, while working at the Georgetown location, Mr. Rodriguez was approved for continuous FMLA and short-term disability leave from May 28, 2019, through July 7, 2019, (D.I. 35 at 139-43), for dizziness, numbness in his hands and feet, and joint pain. (D.I. 40 at 72). In early August 2019, Mr. Rodriguez applied for intermittent FMLA leave for July 31, 2019, through July 1, 2020 (D.I. 40 at 165-67). Cigna approved Mr. Rodriguez's request, but because Cigna's policy was only to approve intermittent FMLS leave in six-month increments, (D.I. 35 at 190), Mr. Rodriguez received leave from July 31, 2019, through January 30, 2020. (*Id.* at 144-47). Mr. Rodriguez testified that he used his intermittent FMLA leave to attend medical appointments on Fridays, as that was when there were no doctors in the My Eye Doctor office. (D.I. 40 at 66).

My Eye Doctor provides a letter from Cigna, dated January 23, 2020, notifying Mr. Rodriguez that his intermittent leave is set to expire on January 30th. (D.I. 35 at 148). My Eye Doctor also provides a letter from Cigna, dated May 29, 2020, indicating that Mr. Rodriguez must provide additional information from his healthcare provider in order to extend his leave.[4]

---

[4] My Eye Doctor says that the letter is in response to Mr. Rodriguez's request to extend his intermittent FMLA leave beyond January 30, 2020. (D.I. 33 at 3-4). The letter, however, states that Mr. Rodriguez requested to extend his leave "to 01/30/2020" (D.I. 35 at 258) and lists the requested period of leave as "07/31/2019-01/30/2020." (*Id.* at 260). The same letter indicates that Mr. Rodriguez's intermittent leave from July 31, 2019, to January 20, 2020, had already been

(*Id.* at 258-64). Mr. Rodriguez, however, testified that it was never communicated to him that he had exhausted his FMLA leave. (D.I. 40 at 75).

According to Mr. Rodriguez, Ms. Smith—at that point the district manager—informed Mr. Rodriguez's general manager, Ms. Ropp, that Mr. Rodriguez could no longer take off on Fridays because he was needed in the office. (*Id.* at 67). Ms. Ropp communicated this to Mr. Rodriguez "in the middle of 2019 and 2020."[5] (*Id.* at 68). Mr. Rodriguez testified that he tried to speak to Ms. Smith about his FMLA leave just prior to the COVID-19 shutdown, and that she said in response, "We just need you in the office." (*Id.* at 69-70.) Ms. Smith denies telling Mr. Rodriguez that he could no longer take his FMLA leave. (D.I. 35 at 116). She does, however, recall speaking with him in March 2020 about the possibility that Mr. Rodriguez was "abusing" his FMLA leave, as he had begun calling out of work in the mornings (rather than doing so ahead of time) and declining to supply explanations or documentation for his absences aside from saying, "it is for my FMLA." (*Id.*).

## C.     The COVID-19 Pandemic and Mr. Rodriguez's Termination

At the very beginning of the COVID-19 pandemic, My Eye Doctor partially closed its offices. Several employees—Ms. Straus, Ms. Musca, and Ms. Ropp, but not Mr. Rodriguez, who was not working—came in only a few days a week. (D.I. 40 at 54-55). Then, on March 19, 2020, My Eye Doctor announced that it would close all its offices from March 23, 2020, through April 3, 2020, and furloughed all its employees. (D.I. 35 at 106). My Eye Doctor continued to pay its employees during this period. (*Id.* at 106-07). My Eye Doctor stopped paying Mr. Rodriguez after the two-week furlough, at which point he went on unemployment. (D.I. 40 at 77).

---

approved. (*Id.* at 258). Whether or not Cigna's description of the requested leave period contains a typo, it is apparent that Cigna required additional information from Mr. Rodriguez before extending his leave beyond January 30, 2020.

[5] I can only guess what date this is supposed to mean.

6

As the pandemic progressed, My Eye Doctor's patient volume and company revenue significantly decreased. (D.I. 35 at 107). My Eye Doctor determined that it could longer support its pre-pandemic staffing model, and, on June 23, 2020, it implemented a reduction in force ("RIF"). (*Id.*). As a result of the RIF, three hundred eighty-eight employees were terminated nationwide, including twenty-three eyewear consultants in Mr. Rodriguez's region. (*Id.*). Mr. Rodriguez was in this group. (*Id.*). The relevant decisionmakers were Mr. Wills and possibly also Ms. Jones (*id.* at 31-32),[6] and Mr. Rodriguez's performance deficiencies were taken into consideration (*id.* at 23; *see also id.* at 159-69).[7] My Eye Doctor also terminated Ms. Taube, as well as Colleen Beyer, a non-Hispanic woman above the age of 40 who worked as an optometric technician at the Seaford and Georgetown locations. (*Id.* at 108; D.I. 40 at 59, 105). Ms. Straus and Ms. Musca were not terminated; both returned to work following the two-week furlough. (D.I. 40 at 104-05).

Mr. Rodriguez's termination letter stated that he would not be recalled from the furlough, and it described his position as eliminated. (D.I. 40 at 141). Approximately 3 weeks later, My Eye Doctor posted an employment ad for an eyewear consultant at the Georgetown location (*id.* at 142), and it subsequently hired Daryan Johnson and Kate Compton for that role.[8] (D.I. 40 at 154). Ms. Johnson and Ms. Compton are white, non-Hispanic, and under the age of 40. (*Id.* at 154, 188-89; D.I. 35 at 179).

---

[6] Per My Eye Doctor's discovery responses, the following individuals were "involved in the investigation of the incidents leading to [Mr. Rodriguez's] termination" and have "knowledge of his performance issues": Mr. Wills, Ms. Smith, Ms. Hollis, Ms. Ropp, and Ms. Jones. (D.I. 35 at 25-26).

[7] My Eye Doctor provides a spreadsheet of employees who were included in the RIF. (D.I. 35 at 159-69). The spreadsheet lists Mr. Rodriguez and notes that he has "performance issues." (*Id.* at 166). The same note accompanies Ms. Taube's name, but not that of Ms. Musca or Ms. Straus. (*Id.*).

[8] My Eye Doctor states that Ms. Johnson was hired to fill a position posted in September 2020. (D.I. 35 at 179).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence … of a genuine dispute …." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a

8

reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III.    DISCUSSION

### A.    Sex, Sexual Orientation, Race, National Origin, and Age Discrimination Claims

Mr. Rodriguez alleges that My Eye Doctor's "refusal to rehire or bring Mr. Rodriguez back to work in June 2020" (D.I. 39 at 10) constituted unlawful discrimination on the basis of sex, sexual orientation, race, national origin, and age. (D.I. 1 at 2, 8).

Title VII discrimination claims are governed by the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Employment discrimination claims under § 1981 and Title VII have the same elements. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010). So do DDEA claims. *Wagenhoffer v. Visionquest Nat'l Ltd.*, 2016 WL 3947952, at *3 (Del. Super. Ct. July 14, 2016) ("The DDEA's language 'is substantially the same as' Title VII's, and Delaware courts have repeatedly held that case law interpreting Title VII is relevant to any state law discrimination claim."). So do age discrimination claims under the ADEA. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

First, the plaintiff must establish a *prima facie* case of the complained-of discrimination or retaliation. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Third Circuit has held that "to establish a *prima facie* claim of discrimination, a plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for the position he sought to attain or retain; 3) he suffered an adverse employment action; and 4) the action occurred under circumstances that could give rise

to an inference of intentional discrimination." *Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018) (cleaned up).

Once a *prima facie* case has been established, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the alleged adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802-03. At this stage, a defendant need not prove that the articulated reason actually motivated the adverse employment action; a defendant need only articulate any legitimate reason for the discharge. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir. 1997) (noting that the defendant's burden to proffer a non-discriminatory rationale is "relatively light").

After the employer proffers a reason for the action, the burden shifts back to Plaintiff to establish that the employer's articulated rationale is pretext. *Id.* at 804. "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (cleaned up). "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764. This two-pronged disjunctive test is known as the *Fuentes* test.

Mr. Rodriguez specifies in his opposition brief that the relevant adverse employment action is My Eye Doctor's "refusal to rehire or bring Mr. Rodriguez back to work in June 2020," (D.I. 39 at 10), rather than his termination, as is alleged in the complaint. (D.I. 1 at 8).

10

### 1.   Sex

As My Eye Doctor notes (D.I. 42 at 7 n. 4), Mr. Rodriguez's complaint does not make it clear that he brings a sex discrimination claim. Sex discrimination is not mentioned in Count I, which contains Mr. Rodriguez's Title VII claims (D.I. 1 at 8-9), nor is it mentioned in any of the other Counts in the complaint (*id.* at 9-13). Although the Counts make no mention of national origin discrimination and sexual orientation discrimination either (*id.* at 8-13), the parties have briefed these two claims on the merits (*e.g.*, D.I. 34 at 7 n. 8, 7-12; D.I. 39 at 9-15). I therefore consider those arguments here. *See* FED. R. CIV. P. 8(e) ("Pleadings must be construed as to do justice"). By contrast, My Eye Doctor discusses sex discrimination in its reply brief only. (D.I. 42 at 7). A reply brief is not the proper place to first challenge a claim on summary judgment. I therefore DENY Defendant's motion for summary judgment on the sex discrimination issue.

### 2.   Sexual Orientation

My Eye Doctor does not dispute that Mr. Rodriguez has met the first three elements of a *prima facie* claim of sexual orientation discrimination. Therefore, the only question remaining is whether the circumstances surrounding My Eye Doctor's failure to bring back Mr. Rodriguez gives rise to an inference of sexual orientation discrimination. I conclude that they do not.

A plaintiff may satisfy the fourth element by presenting evidence that similarly situated employees, outside of the protected class, were treated more favorably. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). The Third Circuit has stated that the fact that a plaintiff was replaced by someone outside his protected class is sufficient to establish an inference of discrimination. *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007); *Maynard v. Goodwill Indus. of Delaware*, 678 F. Supp. 2d 243, 253 (D. Del. 2010). A plaintiff may also support an inference of discrimination with non-comparator

evidence, "including, but not limited to … evidence of similar [sexual orientation] discrimination of other employees, or direct evidence of discrimination from some statements or actions by [his] supervisors suggesting … animus" based on the protected class. *Golod v. Bank of America Corp.*, 403 F. App'x 699, 702 n. 2 (3d Cir. 2010); *Arku-Nyadia v. Legal Sea Foods, LLC*, 2020 WL 6111001, at *3 (D.N.J. Oct. 16, 2020).

My Eye Doctor argues that Mr. Rodriguez's *prima facie* case fails because he has not demonstrated that heterosexual employees were treated more favorably. (D.I. 33 at 9; D.I. 42 at 11). Indeed, Mr. Rodriguez has not offered evidence, nor has he argued, that any of the My Eye Doctor employees he presents as comparators (such as Ms. Compton or Ms. Johnson) are heterosexual. An absence of comparator evidence does not end the matter, however. Mr. Rodriguez is not required to present comparator evidence to support an inference of discrimination. "Such an inference can be supported [by] … direct evidence of discrimination from some statements or actions by [his] supervisors suggesting … animus" based on sexual orientation. *Golod*, 403 Fed. App'x at 702 n. 2.

Mr. Rodriguez attempts to invoke this avenue by highlighting two remarks that Mr. Rager made while visiting the Milford office: (1) while demonstrating a new method to display eyeglasses, Mr. Rager disparagingly referred to the method as "gay"; and (2) while discussing a restaurant at Rehoboth beach that other employees had recommended, Mr. Rager "made a limp wrist gesture and stated that he did not know so many 'people' were there." (D.I. 39 at 5). These comments, although inappropriate and grounds for discipline, are not enough to support an inference of discrimination here.

"Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the

12

date of decision." *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Indeed, "discriminatory statements … made by non-decision-makers or individuals who played no part in the decision are inadequate to support an inference of discrimination." *Foster v. New Castle Area Sch. Dist.,* 98 F. App'x. 85, 87 (3d Cir. 2004) (citing *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995)). Although "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate," *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001), no evidence in the record suggests that Mr. Rager played a part in the ultimate decision. Rather, the record suggests that the only individuals with input were Mr. Wills, the regional manager, and possibly also Ms. Jones, who was the district manager until June 2019. (D.I. 35 at 31-32). Nor is there evidence that Mr. Rager made these statements in temporal proximity to the RIF. Consequently, I do not think that these remarks from Mr. Rager adequately support an inference of discrimination.

As Mr. Rager's remarks are the only direct evidence of animus that Mr. Rodriguez presents, I agree with My Eye Doctor that Mr. Rodriguez has failed to make a *prima facie* case of sexual orientation discrimination. I therefore GRANT My Eye Doctor's motion for summary judgment as to this claim.

### 3.   Race/National Origin

#### a.   *Prima Facie* Case

My Eye Doctor does not dispute that Mr. Rodriguez has met the first three elements of a *prima facie* claim of race and national origin discrimination. Thus, again, the sole question is whether Mr. Rodriguez has met his burden of establishing that My Eye Doctor's failure to bring him back occurred under circumstances that give rise to an inference of discrimination. This

13

time, Mr. Rodriguez has established a *prima facie* case. The parties agree that Mr. Rodriguez was replaced by Ms. Compton and Ms. Johnson, neither of whom are Hispanic. This is sufficient to establish an inference of discrimination. *Keebler-Sunshine Biscuits,* 214 F. App'x at 242.

### b.    Non-Discriminatory Rationale

My Eye Doctor has met its burden of production by proffering two legitimate non-discriminatory reasons for declining to bring back or rehire Mr. Rodriguez: My Eye Doctor's decision to downsize because of the COVID-19 pandemic, as well as Mr. Rodriguez's performance issues. (D.I. 42 at 2).

Mr. Rodriguez challenges these rationales as insufficient. With respect to the first rationale, he argues that, because the relevant adverse employment action is My Eye Doctor's decision not to rehire him (rather than its decision to terminate him), My Eye Doctor cannot rely on the initial COVID-19 RIF. (D.I. 39 at 14). My Eye Doctor, however, has stated that its decision to downsize also drove its decision not to rehire Mr. Rodriguez. (D.I. 42 at 2). I therefore find the first rationale to be a legitimate one.

With respect to the second rationale, Mr. Rodriguez argues that My Eye Doctor cannot legitimately rely on performance issues, as Mr. Rodriguez did not have any documented performance issues at Georgetown (and, indeed, performed well there). (D.I. 39 at 14). But My Eye Doctor has produced documentation of longstanding concerns with Mr. Rodriguez's performance: a weak performance evaluation (D.I. 35 at 124-29), a final written warning (*id.* at 133), evidence of a performance improvement plan (*id.* at 134-37), and a spreadsheet noting Mr. Rodriguez's "performance issues" that was prepared contemporaneously with My Eye Doctor's decision not to rehire Mr. Rodriguez (*id.* at 166). The Third Circuit has held that unsatisfactory work performance constitutes a legitimate, non-discriminatory basis for adverse employment

14

actions. *See, e.g.*, *Parson v. Vanguard Group*, 702 F. App'x 63, 67-68 (3d Cir. 2017). Accordingly, My Eye Doctor has satisfied its burden here.

### c.      Pretext

As My Eye Doctor has met its burden of production, to survive summary judgment, Mr. Rodriguez must produce evidence from which a reasonable jury could conclude that My Eye Doctor's proffered reasons are pretextual. I conclude that Mr. Rodriguez has not met this burden.

Mr. Rodriguez presents evidence directed at both prongs of the *Fuentes* test. I examine his arguments in turn.

### i.      Prong One

Under prong one, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder *could* rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. *Fuentes*, 32 F.3d at 764-65. In other words, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999) (cleaned up).

Mr. Rodriguez contends that the termination letter he received shows that My Eye Doctor's proffered rationales are "inconsistent and unbelievable." (D.I. 39 at 14-15). Mr. Rodriguez points out that the letter did not cite any performance deficiencies and stated that he was a valued employee. (*Id.*). Such generic language is to be expected of a form letter, however, and, as My Eye Doctor asserts in its reply, Mr. Rodriguez's letter was "the standard COVID-19 RIF form letter" sent to hundreds of terminated employees. (D.I. 42 at 4).

This helps to explain the second apparent inconsistency that Mr. Rodriguez identifies: the fact that the letter "falsely" claimed that his position was being eliminated when, in fact, that position was posted a few weeks after his termination. (*Id.* at 14). The full "claim" in the letter is as follows: "Your medical, dental, and vision benefits, if applicable, will continue through the end of the month in which your position was eliminated (through June 30, 2020)." (D.I. 35 at 158). This, too, is vague language typical of a form letter; it is unclear whether "your position" refers to eyewear consultants in general, or Mr. Rodriguez's position as an eyewear consultant, specifically. In any event, the purpose of that passage was not to convey the reason for termination, but rather, to communicate the remaining duration of the terminated employees' health benefits. Where the letter does address a reason for the termination, it specifies that My Eye Doctor's decision is "[d]ue to the unforeseen circumstances surrounding COVID-19 and the need to adjust our business accordingly." (*Id.*). This is exactly the rationale that My Eye Doctor has proffered here.[9] Consequently, I agree with My Eye Doctor that Mr. Rodriguez's termination letter is not suggestive of pretext.

### ii.    Prong Two

Under prong two, a plaintiff must show that an employer's discriminatory reason was more likely than not a motivating cause of the employer's action. *Fuentes,* 32 F.3d at 764. To do so, a plaintiff may, for example, show that an employer has previously discriminated against him, that the employer has previously discriminated against other persons within the protected class, or that the employer has treated other similarly situated employees not within the protected

---

[9] As for the posting of the eyewear consultant position, I am not convinced that its timing (three weeks after Mr. Rodriguez was terminated) significantly undermines this rationale. My Eye Doctor presents evidence that it hired Ms. Compton because it had recently taken on a new optometrist. (D.I. 43 at 1-2). As My Eye Doctor notes in its reply (D.I. 42 at 4), the early months of the pandemic presented rapidly changing circumstances to which businesses tried—and sometimes struggled—to adapt.

class more favorably. *Fuentes*, 32 F.3d at 765; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

Mr. Rodriguez asserts that Mr. Rager's comments towards Mr. Rodriguez are evidence of discrimination. (D.I. 39 at 10-11). He points to multiple occasions on which Mr. Rager—seemingly intentionally—referred to Mr. Rodriguez by Hispanic names other than his own, as well as the incident in which Mr. Rager intimated that the Milford office gave Hispanic patients preferential treatment with respect to discounts. (*Id.* at 4-5). This behavior might reflect discriminatory animus on the part of Mr. Rager, but as discussed, no evidence in the record suggests that Mr. Rager took part in the ultimate decision not to bring back Mr. Rodriguez. Mr. Rodriguez has also failed to show that these incidents occurred in temporal proximity to the decision. Generally, discriminatory remarks by non-decisionmakers are entitled to less weight, especially where the plaintiff does not establish that the remarks came close to the decision date. *Ezold*, 983 F.2d at 545. I decline to depart from this principle here.

Mr. Rodriguez also suggests that My Eye Doctor treated white, non-Hispanic employees more favorably than Mr. Rodriguez. (D.I. 39 at 2). "To make a comparison of plaintiff's treatment to that of an employee outside plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that she and the employee are similarly situated in all relevant respects." *Smith v. Walgreen Co.*, 964 F. Supp. 2d 338, 349 (D. Del. 2013) (cleaned up). "Whether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case." *Id.* (cleaned up). Mr. Rodriguez identifies Ms. Musca and Ms. Straus, both eyewear consultants at the Georgetown office, who were brought back in June 2020 when Mr. Rodriguez was not. (D.I. 39 at 2). But no evidence in the record suggests that these two employees were outside Mr. Rodriguez's protected class (*i.e.*, non-Hispanic); all Mr. Rodriguez

provides is a bare assertion to that effect in his opposition brief. (D.I. 39 at 12). This is insufficient. Thus, Ms. Musca and Ms. Straus are not valid comparators here.

Mr. Rodriguez next points to his replacements: Ms. Compton and Ms. Johnson, who My Eye Doctor hired to fill eyewear consultant positions after Mr. Rodriguez was terminated (*id.* at 14-15), as well as Ms. Smith, who My Eye Doctor hired to take Mr. Rodriguez's place as general manager of the Milford office after he relocated. (*Id.* at 11). This time, the evidence of record reflects that all three of these women are white and non-Hispanic. (D.I. 35 at 120-21, 179; D.I. 40 at 122-23). For the reasons discussed below, however, I conclude that no reasonable jury could find that the circumstances of these replacements raise a reasonable inference of discrimination.

Although the hiring of someone not in the protected class as a replacement is enough to give rise to an inference of unlawful discrimination at the *prima facie* stage, *Keebler-Sunshine Biscuits*, 214 F. App'x at 242, something more is required here. Mr. Rodriguez must "point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race or national origin] was a motivating or determinative factor in the employment decision." *Simpson*, 143 F.3d at 644-45. The fact that Mr. Rodriguez's replacements were outside his protected classes, standing alone, is not sufficiently probative. The additional evidence that Mr. Rodriguez presents is unconvincing. He asserts in his opposition brief that Ms. Musca and Ms. Straus have "far less experience than [Mr. Rodriguez] as [eyewear consultants]," (D.I. 39 at 10), but this assertion is unsupported by his citations to the record. He argues that the same is true of Ms. Smith (*id.* at 6), but that argument is belied by evidence that My Eye Doctor

has presented that, at the time she was hired, Ms. Smith had "extensive leadership and training experience, of which the last five years has been in the optical industry."[10] (D.I. 35 at 138).

Finally, Mr. Rodriguez argues that "while working at the Georgetown location, [he] was … regularly excluded from meetings regarding policy and procedure changes while the Caucasian, younger, female employees were kept up to date about changes." (D.I. 39 at 7). No evidence in the record suggests that these incidents occurred as a result of racial animus, and Mr. Rodriguez does not tie these incidents to My Eye Doctor's decision not to rehire him. Rather, he testifies that the individuals who excluded him were Ms. Ropp, Ms. Musca, and Ms. Straus (D.I. 40 at 86), none of whom are among the individuals who My Eye Doctor testified had input into the ultimate decision (D.I. 35 at 31-32).

For the reasons stated above, I find that none of these arguments, singularly or collectively, is enough to carry Mr. Rodriguez's burden on the question of pretext for his race and national origin discrimination claims. I therefore GRANT My Eye Doctor's motion for summary judgment as to these claims.

### 4.    Age

#### a.    *Prima Facie* Case

To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must demonstrate that "[he] (1) was a member of a protected class, i.e., that [he] was over forty, (2) is qualified for the position, (3) suffered an adverse employment decision, (4) and was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination." *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001). My Eye Doctor does not dispute that Mr.

---

[10] I doubt that Ms. Smith is particularly relevant for the additional reason that there is no claim of discrimination in relation to the demotion that created the vacancy.

Rodriguez has established all four elements. I therefore proceed to the next step in the framework.

### b.      Non-Discriminatory Rationale

The rationales that My Eye Doctor proffers are the same as those it proffered for the other discrimination claims discussed above. (*See, e.g.*, D.I. 42 at 2). Mr. Rodriguez's challenges to those rationales are also the same. (*See* D.I. 39 at 14). I therefore conclude, for the same reasons as before, that My Eye Doctor has satisfied its burden of production here.

### c.      Pretext

The evidence that Mr. Rodriguez offers as support for pretext is yet again directed at both prongs of the *Fuentes* test. Mr. Rodriguez's evidence and arguments directed at prong one, however, are identical to those he raised with respect to the discrimination claims already discussed. (*See* D.I. 39 at 14-15). I similarly reject them here. I therefore focus my analysis on the arguments that are directed at prong two.

Mr. Rodriguez points to his testimony that Ms. Musca and Ms. Straus, who were his coworkers at the Georgetown location, repeatedly referred to him as an "old man" and a "dinosaur." (D.I. 39 at 12). But Mr. Rodriguez does not dispute My Eye Doctor's evidence that Ms. Musca and Ms. Straus took no part in its decision not to bring back Mr. Rodriguez. (D.I. 35 at 31-32). Their comments, therefore, are of little weight here. *See Ezold*, 983 F.2d at 545.

Mr. Rodriguez also argues that My Eye Doctor treated younger employees more favorably. (*See* D.I. 39 at 6-7, 10). He identifies Ms. Musca and Ms. Straus—both of whom were significantly under 40 years old (D.I. 40 at 120-121)—as comparators, arguing they received preferential treatment because My Eye Doctor brought them back to work, but not Mr. Rodriguez. (D.I. 39 at 10). Mr. Rodriguez also points to the fact that Ms. Taube, the only other

eyewear consultant at the Georgetown location who was over the age of 40, was not brought back either. (*Id.*). The trouble with Mr. Rodriguez's argument is that neither Ms. Musca nor Ms. Straus are "similarly situated in all relevant respects," as is required for such comparisons for Title VII purposes. *Walgreen Co.*, 964 F. Supp. 2d at 349. Mr. Rodriguez has offered no evidence that either Ms. Musca or Ms. Straus demonstrated performance deficiencies while employed at My Eye Doctor; My Eye Doctor, however, has proffered a spreadsheet noting performance deficiencies for Mr. Rodriguez and Ms. Taube, but not for Ms. Musca or Ms. Straus. (D.I. 35 at 166).

Mr. Rodriguez next contends that the fact that My Eye Doctor replaced him with younger employees (Ms. Smith, Ms. Compton, and Ms. Johnson) is evidence of pretext. (D.I. 39 at 11, 15). Replacement with a younger person, without more, is insufficient to create a genuine issue of material fact. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 748 (9th Cir. 2003) ("Without more … the fact that [the replacement] was younger than [the terminated employee] does not create a triable issue of pretext."); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 767 (D.C. Cir. 2002) ("The … decision to replace her with a younger woman is insufficient for a jury to conclude that she lost out because of her age.") (cleaned up). Mr. Rodriguez's assertions that his replacements were comparatively inexperienced (D.I. 39 at 6, 10) are, as previously explained, insufficient.

Consequently, for the reasons stated above, Mr. Rodriguez does not carry his burden on the question of pretext for his age discrimination claim. I therefore GRANT My Eye Doctor's motion for summary judgment as to this claim.

### B.    FMLA Claims

The Third Circuit has stated that,

> When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."

*Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 301 (3d Cir. 2012) (internal citations omitted). Mr. Rodriguez claims that My Eye Doctor unlawfully interfered with his rights under the FMLA by requiring him to be in the office every day, rather than continuing to allow him to take Fridays off. (*See* D.I. 1 at 10-11; D.I. 39 at 16-17). Mr. Rodriguez also claims that My Eye Doctor's refusal to bring him back to work constituted retaliation against him for exercising his FMLA rights. (D.I. 1 at 10-11; D.I. 39 at 16-17).

### 1.   Interference

To make a claim of interference under the FMLA, a plaintiff must show:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). "[F]or an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Id.* at 192 (citation omitted). Even if plaintiff makes this showing, the FMLA "provides no relief unless the employee has been prejudiced by the violation[.]" *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *Watson v. Drexel University*, 2021 WL 4429826, at *4 (3d Cir. 2021) (affirming grant of summary judgment to defendant on FMLA interference claim because plaintiff failed to show prejudice as a result of defendant's violation).

My Eye Doctor argues that Mr. Rodriguez has failed to present evidence that "he continued to be an eligible employee after January 30, 2020" (prong 1), "he was entitled to

FMLA leave after January 30, 2020" (prong 3), or "he gave notice to [My Eye Doctor] of an intention to continue FMLA leave after January 30, 2020" (prong 4). (D.I. 33 at 16-17). All three of these arguments turn on the January 30, 2020 expiration date of Mr. Rodriguez's intermittent FMLA leave. (D.I. 35 at 148). It is unclear from the record, however, when the alleged interference took place. Mr. Rodriguez testified that Ms. Ropp, his general manager, told him to stop taking his intermittent FMLA leave "in the middle of 2019 and 2020." (D.I. 40 at 67, 70-71). With respect to the period prior to January 30, 2020, My Eye Doctor has neither proved (nor even argued) the absence of a material fact relative to these elements of Mr. Rodriguez's interference claim.

Next, My Eye Doctor contends that Mr. Rodriguez has not shown "that [My Eye Doctor] interfered with his FMLA rights." (D.I. 33 at 17). The record reflects that Ms. Ropp advised Mr. Rodriguez that he could no longer take Fridays off for his medical treatment (D.I. 40 at 67-68), and the parties dispute whether Ms. Smith instructed him to make himself available on all workdays. (*Id.* at 69; D.I. 35 at 116). I therefore find that an issue of material issue of fact exists as to whether the alleged conduct by Ms. Smith and Ms. Ropp constitute interference.

Finally, My Eye Doctor argues that Mr. Rodriguez has not shown that "that he was prejudiced by the alleged interference" (D.I. 33 at 17-18) as Mr. Rodriguez testified that shortly after his conversation with Ms. Smith, My Eye Doctor closed its offices as a result of the COVID-19 pandemic (D.I. 40 at 70). My Eye Doctor's argument, as I understand it, is that even if My Eye Doctor wrongly withheld Mr. Rodriguez's entitlement to take FMLA leave, Mr. Rodriguez had no opportunity to experience prejudice given the timing of the office closures. Mr. Rodriguez also testified, however, that he did not take FMLA leave after Ms. Ropp told him to stop doing so "in the middle of 2019 and 2020." (D.I. 40 at 67). My Eye Doctor says nothing

about whether a reasonable jury could find that the alleged interference prejudiced Mr. Rodriguez during this period. I therefore find that a material issue of fact exists as to prejudice.

For the foregoing reasons, I DENY My Eye Doctor's motion for summary judgment as to Mr. Rodriguez's FMLA interference claim.

### 2.    Retaliation

To prevail on an FMLA retaliation claim, a plaintiff must show that "(1) [he] invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights." *Lichtenstein*, 691 F.3d at 301-02. If the plaintiff makes a *prima facie* showing of those factors, the usual *McDonnell Douglas* burden-shifting framework is implicated; the employer must "articulate some legitimate, nonretaliatory reason for its decision," *id.*, after which the burden shifts to the plaintiff to prove pretext. *Id.*

My Eye Doctor argues that Mr. Rodriguez cannot make a *prima facie* case of retaliation, because he cannot prove that his termination was causally related to the fact that he took FMLA leave. (D.I. 33 at 18). Mr. Rodriguez replies that My Eye Doctor's refusal to bring him back to work while bringing back other employees who did not take FMLA leave, in combination with the alleged statements by Ms. Smith forbidding Mr. Rodriguez from taking FMLA leave, is sufficient to prove causation. (D.I. 39 at 18-19). I conclude that Mr. Rodriguez does not establish the necessary connection to substantiate his *prima facie* case.

Under Third Circuit law, to establish causation for a retaliation claim, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.

2007). In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

Mr. Rodriguez presents no "pattern of antagonism" evidence, nor has he argued the existence of "unduly suggestive" temporal proximity. Mr. Rodriguez does not point to any other circumstantial evidence sufficient to support a causal link finding. His reliance on Ms. Smith's statements is unavailing. Ms. Smith was not a decision-maker concerning the decision to terminate plaintiff. (D.I. 35 at 31-32). Ms. Ropp, the general manager at the Georgetown office who Mr. Rodriguez alleges relayed a message from Ms. Smith forbidding him from taking FMLA leave (D.I. 40 at 68), was not a decision-maker either. (D.I. 35 at 31-32). As Mr. Rodriguez does not dispute this evidence, I do not believe that a reasonable jury could infer a causal link from the statements of Ms. Smith (or those of Ms. Ropp).

Neither am I convinced by Mr. Rodriguez's argument that causation can be inferred from the fact that My Eye Doctor "brought other employees back who did not have FMLA issues." (D.I. 39 at 19). It is unclear who these other employees are, as Mr. Rodriguez does not accompany his point with any citations to the record. In fact, he fails to identify in either the complaint or his answering brief any employees who did not take FMLA leave who were brought back. This is insufficient.

Accordingly, I conclude that Mr. Rodriguez has failed to make a *prima facie* case of FMLA retaliation. I therefore GRANT My Eye Doctor's motion for summary judgment as to this claim.

**C.    ADA Claims**

**1.    Disability Discrimination**

A disparate treatment claim under the ADA operates under the burden-shifting framework of *McDonnell Douglas*. *See Walton v. Mental Health Ass'n of Se. Pennsylvania*, 168 F.3d 661, 667-668 (3d Cir. 1999).

**a.    *Prima Facie* Case**

In order to make a *prima facie* case of disability discrimination under the ADA, a plaintiff must first establish that he: (1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment decision because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir 2006). To satisfy the third element, a plaintiff must show that his disability was a "determinative factor" in the employer's decision to take the adverse employment action. *Fiorentini v. William Penn Sch. Dist.*, 666 Fed. App'x 229, 294 (3d Cir. 2016).

Here, My Eye Doctor does not contest that Mr. Rodriguez is a qualified individual with a disability. (D.I. 33 at 14). My Eye Doctor's failure to rehire or bring back Mr. Rodriguez constitutes an adverse employment action. Although My Eye Doctor asserts that Mr. Rodriguez fails to establish a causal link between his purported disability and his termination, My Eye Doctor doesn't provide any argument on this point. (*Id.* at 15, D.I. 42 at 7-8). I therefore move to the next step of the framework.

**b.    Non-Discriminatory Rationale**

My Eye Doctor proffers the same rationales as before. (*See, e.g.*, D.I. 42 at 8). Mr. Rodriguez's challenges to those rationales are also the same. (*See* D.I. 39 at 14). Thus, I again conclude that My Eye Doctor has satisfied its burden of production here.

### c.   Pretext

Mr. Rodriguez has chosen to combine his ADA disparate treatment arguments and his ADA failure to accommodate arguments. (*See id.* at 19-20). It is therefore difficult for me to determine what, exactly, Mr. Rodriguez offers as evidentiary support for the former. It seems, however, that he offers no evidence distinct from that which I have already discussed and found wanting. (*See, e.g.*, *id.* at 20) (highlighting replacement by new employees "without a disability needing accommodation").

I therefore conclude that Mr. Rodriguez has not met his burden to adduce evidence from which a reasonable jury could conclude that My Eye Doctor's rationales are pretextual, and GRANT My Eye Doctor's motion for summary judgment with regard to Mr. Rodriguez's ADA disparate treatment claim.

### 2.   Failure to Accommodate

The ADA prevents a covered employer from failing to provide "a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). A plaintiff bringing an ADA failure-to-accommodate claim must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (cleaned up). With respect to the employer's notice of the disability, what matters is "whether the employee … provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* at 313.

Here, My Eye Doctor contends that "the record is devoid of any evidence" that Mr. Rodriguez provided My Eye Doctor with notice of a disability or requested a reasonable accommodation. (D.I. 33 at 16). Mr. Rodriguez counters that My Eye Doctor received notice because it was aware of the short-term disability leave and FMLA leave for which Mr. Rodriguez had previously been approved. (D.I. 39 at 20). I agree with Mr. Rodriguez.

My Eye Doctor is right that "the definition of a 'disability' in the ADA is very different from the definition of a 'serious health condition' pursuant to the FMLA." (D.I. 42 at 8); 29 C.F.R § 825.702(b) ("ADA's 'disability' and FMLA's 'serious health condition' are different concepts, and must be analyzed separately."). The Third Circuit, however, has held that "a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA." *Capps*, 847 F.3d at 156-57; *see also* 29 C.F.R. § 825.702(c)(2) (providing example of disabled employee's request for medical leave being treated as both FMLA leave and a reasonable accommodation). Although the Third Circuit has not elaborated upon what those circumstances are, district courts within the circuit have stated that a request for FMLA leave may serve as a request for reasonable accommodation where the employer knows (or has reason to believe) "that the request was based on something other than a one-time" event. *Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 631 (E.D. Pa. 2017).

Here, Mr. Rodriguez received approval for intermittent FMLA leave through January 30, 2020. (D.I. 35 at 144). He testified that he used his FMLA leave to attend medical appointments on a weekly basis (D.I. 40 at 64-67), and that he communicated this to his supervisor (*id.*) and to Human Resources (*id.* at 63-64). This testimony is sufficient to raise a genuine issue of fact as to

whether Mr. Rodriguez's prior FMLA requests provided My Eye Doctor notice of his disability[11] and constituted a request for a reasonable accommodation. As discussed, an issue of fact also exists as to whether My Eye Doctor unlawfully interfered with Mr. Rodriguez's FMLA leave. The notice and request requirements are the only two elements of Mr. Rodriguez's reasonable accommodation claim that My Eye Doctor has challenged. (*See* D.I. 33 at 15-16).

I therefore DENY My Eye Doctor's motion for summary judgment with regard to Mr. Rodriguez's claim that My Eye Doctor discriminated against him by failing to provide a reasonable accommodation.

## IV.    CONCLUSION

An appropriate order will issue.

_____
United States District Judge

---

[11] My Eye Doctor argues that it could not have been on notice because, under its agreement with Cigna, Cigna makes FMLA leave determination decisions "unilaterally." (D.I. 42 at 9). Whether My Eye Doctor had input into the FMLA decision is immaterial here. The question is notice, and for notice, Mr. Rodriguez's communications to his supervisor and to Human Resources are enough. *See Thomas v. Brandywine Hospital, LLC*, 2022 WL 507478, at *6 (E.D. Pa. Feb. 18, 2022).